IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HEATHER LEIGH THARP, | ) | CASE NO. 1:21-CV-00135 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Heather Lee Tharp ("Plaintiff" or "Ms. Tharp") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. §

405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should ensure that his analysis of Ms. Tharp's kidney stones is based on a

clear and accurate review of the medical evidence and explicitly addresses the impact of that

impairment, if any, on her RFC.  He should also ensure that he clearly evaluates the combined

effects of all medically determinable impairments – severe and non-severe – on the RFC.

## I.  Procedural History

A prior application for SSI, which alleged disability due to depressive disorder, was denied on July 17, 2012.  (Tr. 106-25.)  On September 23, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 126-31.)  That decision was not appealed.

On April 4, 2016, Plaintiff filed an application for SSI, and alleged a disability onset date of March 8, 2016.  (Tr. 303-09.)  She alleged disability due to manic depression, bipolar disorder and anxiety disorder.  (Tr. 132.)  Plaintiff's application was denied at the initial level (Tr. 189-91) and upon reconsideration (Tr. 198-99), and she requested a hearing (Tr. 201).  On December 12, 2017, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 42-82.)

On May 30, 2018, the ALJ issued a decision finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from March 8, 2016 through the date of the decision.  (Tr. 165-83.)  Ms. Tharp appealed, and the Appeals Council remanded her case on November 5, 2019.  (Tr. 184-88.)

On April 22, 2020, a second hearing was held before a new ALJ.  (Tr. 83-105.)  On May 6, 2020, the second ALJ issued a decision finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from March 8, 2016 through the date of the decision.  (Tr. 7-28.)  On November 17, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On January 18, 2021, Plaintiff filed a Complaint challenging the final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 14, 16, 17.)

## II. Evidence

**A.      Personal, Educational, and Vocational Evidence**

Plaintiff was born in 1970, and was 46 years old on the alleged disability onset date.  (Tr. 27.)  Under Social Security Regulations, she was a younger individual until February 28, 2020, and an individual approaching advanced age after that date.  (*Id*.)  She had at least a high school education and was able to communicate in English.  (*Id*.)  She has no past relevant work.  (*Id*.)

**B.      Medical Evidence**

**1.      Treatment History for Physical Impairments**

**i.      Prior to Relevant Period**

On January 27, 2016, Ms. Tharp underwent a cystoscopy, ureteroscopy, laser lithotripsy, and extraction of a stone in her left ureter with stent placement.  (Tr. 667-68.)  The stone had previously been treated with lithotripsy but had failed to clear.  (Tr. 667.)  Urologist Christopher Reese, M.D. noted she had a long history of recurrent stones and indicated the stent should remain in place for ten days.  (Tr. 667-68.)

**ii.      During Relevant Period**

On July 30, 2016, Ms. Tharp presented to the Emergency Department ("ED") of Elyria Medical Center complaining of intermittent sharp pain in her right flank.  (Tr. 1823.)  On examination, findings were normal except for moderate discomfort.  (Tr. 1827-28.)  A CT scan confirmed multiple kidney stones and a moderately obstructing stone in the right ureter.  (Tr. 1834.)  She was prescribed Percocet and Phenergan and advised to follow up with Dr. Reese.  (Tr. 1829, 1835.)  Dr. Reese performed a cystoscopy, ureteroscopy, laser lithotripsy, stone extraction, and stent placement on August 10, 2016.  (Tr. 1062-63.)  A follow-up CT scan at the ED on August 14, 2016 revealed a possible migration of the stent into the urethra, multiple non-

3

obstructing kidney stones, and hepatic steatosis, with urologic consultation recommended.  (Tr. 1022-23.)

On November 11, 2016, Ms. Tharp returned to the ED for left sided flank pain.  (Tr. 1799.)  On examination, she appeared uncomfortable and displayed tenderness to palpation of the left flank.  (Tr. 1803.)  Imaging confirmed bilateral non-obstructing kidney stones and left pelvic caliectasis.  (Tr. 1810-11.)   She was prescribed Zofran, Macrobid, Pyridium, and Percocet, and discharged with instructions to follow up with her urologist. (Tr. 1804-05.)

Ms. Tharp returned to the ED on November 13, 2016, complaining of continued left flank pain for three days.  (Tr. 1776.)  She explained that nausea was preventing her from taking the previously prescribed Percocet.  (Tr. 1786.)   On examination, she displayed mild distress and left flank pain with radiation to the left inguinal area.  (Tr. 1780.)  A CT scan showed hepatic steatosis, an obstructing calculus in the left ureter with a moderate left hydroureteronephrosis, and multiple additional bilateral non-obstructing kidney stones.  (Tr. 1786.)  She declined hospital transfer for treatment with her urologist Dr. Reese because she "had small children at home that she must care for," and said she would contact Dr. Reese on Monday for a follow up appointment.  (*Id*.)  She was prescribed Phenergan and discharged.  (Tr. 1781, 1787.)

On November 15, 2016, Ms. Tharp attended an office visit with Dr. Reese for treatment of severe flank pain.  (Tr. 1312.)  She reported that "pain medication [was] not helping."  (*Id*.)  Physical examination results were in the normal range.  (Tr. 1313.)  Dr. Reese diagnosed bilateral kidney stones, hematuria, left flank pain, and a ureteral stone on the left side, with a plan to perform an extracorporeal shock wave lithotripsy ("ESWL") on the left side.  (*Id*.)

On November 19, 2016, Ms. Tharp returned to the ED for treatment of flank pain, explaining that she had surgery for a left-sided kidney stone scheduled for Monday, but the pain

4

had become too much. (Tr. 1757, 1761.) Physical examination results reflected mild distress. (Tr. 1761.) An x-ray revealed bilateral kidney stones, with further ultrasound or CT scanning indicated. (Tr. 1764.) She was treated with Ketorolac Tromethamine, Promethazine, Hydromorphone, Benadryl, Dilaudid, and Phenergan, and discharged feeling much better. (Tr. 1764-66.) Her request for a Percocet prescription was denied, and she stated that she would follow up with Dr. Moore on Monday for additional pain medications. (Tr. 1766.)

Ms. Tharp returned to the ED on January 2, 2017, complaining of left flank pain, nausea, and vomiting related to kidney stones. (Tr. 1732, 1736.) Physical examination results were in the normal range. (Tr. 1736.) A CT scan noted a left ureteral calculus causing mild left-sided hydronephrosis and moderate left hydroureter, as well as bilateral kidney stones consistent with medullary nephrocalcinosis. (Tr. 1742-44.) She was prescribed Percocet and Phenergan, and discharged. (Tr. 1738, 1744.) Ms. Tharp saw Dr. Reese for follow-up treatment on the same day. (Tr. 1309-11.) Examination results were in the normal range. (Tr. 1310.) Dr. Reese noted she had passed stone fragments recently, but still had pain. (Tr. 1309.) He discussed treatment options with Ms. Tharp, including a plan for a cystoscopy, retrograde pyelogram, with a possible ureteroscopy, stone extraction, and stent. (Tr. 1311.) Dr. Reese performed a cystoscopy, bilateral retrograde pyelogram and bilateral ureteroscopy on January 18, 2017, but identified no evidence of stones remaining in the ureter. (Tr. 1059-60, 1351-52.)

On February 9, 2017, Ms. Tharp returned to the ED seeking treatment for left flank pain and nausea, with a history of kidney stones. (Tr. 1709, 1713.) Physical examination results were in the normal range, except for mild distress. (Tr. 1713.) She was prescribed Cipro, Anaprox, and Percocet, and discharged with instructions to follow up with Dr. Reese. (Tr. 1714, 1718.)

On April 28, 2017, Ms. Tharp sought care for blurred vision, which had begun six months prior.  (Tr. 1273.)  Dr. Jason Ridgel ordered blood testing and assessed diabetes mellitus without complications.  (Tr. 1274.)  Physical examination results were in the normal range, and Dr. Ridgel noted intact insight and judgment and normal mood and affect.  (Tr. 1279.)

At a February 19, 2018 diabetes management appointment, Dr. Ridgel noted that Ms. Tharp had been diagnosed with diabetes a year prior, with symptoms of blurred vision, increased appetite, and weight gain.  (Tr. 1271.)  He noted she did not check her blood sugars, but had good compliance with treatment, and did not require any medication.  (*Id*.)  Physical examination results were in the normal range, and Dr. Ridgel noted normal mood and affect.  (Tr. 1272.)

On May 25, 2018, Ms. Tharp returned to Dr. Ridgel for treatment of shoulder pain that had been occurring in a persistent pattern for the past five weeks.  (Tr. 1269.)  Physical examination results were normal except for pain and weakness on abduction and internal rotation of her left arm and shoulder, and a positive empty can test.  (Tr. 1270.)  Dr. Ridgel noted normal mood and affect.  (*Id*.)  He diagnosed an injury to her left rotator cuff, and prescribed NSAID medication and physical therapy.  (*Id*.)

On October 13, 2018, Ms. Tharp sought treatment at the ED for left flank pain with nausea and vomiting.  (Tr. 2004.)  On examination, she was mildly tender to palpation in the left lower quadrant with severe CVA tenderness on the left.  (Tr. 2005.)  A CT scan revealed multiple bilateral kidney stones that were non-obstructing, but no ureteral calculi.  (Tr. 2006-8.)  The ED doctor prescribed Naproxen, Tylenol, Zofran, and a heating pad.  (Tr. 2006.)

She returned to Dr. Ridgel with cold symptoms on October 17, 2018.  (Tr. 1265.)  He noted that she had asthma and assessed acute bronchitis.  (Tr. 1266.)  He recommended fluids, rest, and oral prednisone.  (*Id*.)

6

On January 29, 2019, Ms. Tharp was referred for a neurological evaluation due to complaints of chills, neck pain, right-sided weakness and drooping of the right side of her face, memory loss, and blackouts.  (Tr. 1300.)  Physical examination results were normal except for decreased sensation in the right upper and lower extremities and decreased vibratory sense on the right side.  (Tr. 1301-02.)  Neurologist Ahmad Siddiqi noted normal cognitive function, including normal short- and long-term memory.  (Tr. 1301.)  He noted she had not been taking her psychotropic medications for more than a month.  (Tr. 1302.)  An MRI taken of her brain was suggestive of intracranial atherosclerosis or other small vessel narrowing but could also be caused by a demyelinating or post inflammatory process.  (Tr. 1607-08.)  Dr. Siddiqi's impression reflected complaints of memory changes, right facial numbness, and numbness and tingling of the extremities.  (Tr. 1302.)  He recommended aspirin, a statin medication, B12, folate, and a carotid duplex to better evaluate vessel abnormalities.  (Tr. 1303.)  The undersigned has not been made aware of any related follow-up evaluation or treatment.

On January 16, 2019, Ms. Tharp sought treatment at the ED for right flank pain which had begun gradually a week prior.  (Tr. 1616, 1620.)  On examination, she demonstrated right flank tenderness to percussion.  (Tr. 1620.)  She was treated with Ondansetron, Ketorolac Tromethamine, Morphine Sulfate, and Promethazine.  (Tr. 1621.)  A CT scan revealed bilateral non-obstructive nephrolithiasis, but no signs of obstructive uropathy.  (Tr. 1627-28.)  She was discharged with instructions to follow up with her primary care provider.  (Tr. 1628.)

On February 19, 2019, Ms. Tharp returned to the ED complaining of left flank pain, beginning five days before.  (Tr. 1565, 1568.)  On examination, she appeared uncomfortable and displayed left CVA tenderness.  (Tr. 1568-69.)  She was treated with Morphine Sulfate, Ondansetron, and Ketorolac Tromethamine.  (Tr. 1578.)  CT imaging confirmed an obstructing

stone of the left ureter with left hydronephrosis and bilateral kidney stones.  (Tr. 1575-77.)  She was discharged with prescriptions for Keflex, Flomax, and Oxycodone/acetaminophen, and instructions to follow up with Dr. Reese.  (Tr. 1570, 1577.)

She returned to the ED on February 22, 2019, complaining of continued left flank pain, nausea, and vomiting, beginning four days before.  (Tr. 1538, 1542.)  She demonstrated mild distress on examination, with left CVA tenderness and poor turgor.  (Tr. 1542.)  She was treated with Ondansetron, Ketorolac Tromethamine, Fentanyl Citrate, and Promethazine via IV.  (Tr. 1551.)  Imagery confirmed multiple bilateral kidney stones with persistent moderate left hydronephrosis.  (Tr. 1549-50.)  She was discharged with prescriptions for Oxycodone, Zofran, Trotonix, Toradol, and Flomax, and instructed to follow up with Dr. Ridgel. (Tr. 1544, 1550-51.)

Ms. Tharp returned to the ED for treatment for left flank pain on February 23, 2019, with notes indicating it was her third ED visit in a week.  (Tr. 1514, 1517-18.)  She reported being prescribed Percocet to take at home but being unable to keep it down due to nausea.  (Tr. 1518.)  She displayed mild distress on examination.  (*Id.*)  She was treated by IV with Morphone Sulfate, Promethazine, Fentanyl Citrate, and Ondansetron.  (*Id.*)  Imaging confirmed non-obstructing bilateral renal stones and multiple calcifications of the pelvis.  (Tr. 1524-25.)  She was prescribed Phenergan and discharged with instructions to follow up with her urologist.  (Tr. 1519, 1526.)

She was admitted to the hospital on February 25, 2019, after presenting to the ED on three consecutive days and complaining of vomiting up her oral pain medication.  (Tr. 1495-97.)  She reported she had not been able to see Dr. Reese for over a year due to transportation and financial issues, and therefore had not been on Urocit-K to lower her calcium.  (Tr. 1499.)  Physical examination results were in the normal range.  (Tr. 1498.)  She was treated with Flomax, Toradol, Ultram and Phenergan, and admitted for treatment of her left-sided ureteral

lithiasis with resultant hydronephrosis.  (Tr. 1499-1500.)  She underwent surgery to remove a left ureteral calculus and insert a stent on February 27, 2019 (Tr. 1511-13), and was discharged on February 28, 2019, with instructions to follow up with a urologist in six months (Tr. 1494-96). On March 15, 2019, she underwent a cystoscopy, extraction and removal of stent, and left retrograde pyeloureterogram.  (Tr. 1493-1494.)

She returned to the ED with complaints of bloating and abdominal pain radiating to the bilateral flanks on March 30, 2019.  (Tr. 1438, 1441-42.)  She appeared uncomfortable on examination, with bilateral CVA tenderness.   (Tr. 1442.)  She was treated with Ondansetron and Morphine Sulfate.  (Tr. 1454-55.)  An abdominal CT revealed bilateral ovarian cysts and non-obstructing nephrolithiasis throughout both kidneys, but no ureteral calculi.  (Tr. 1451-52.)  She was discharged with a prescription for Zofran and instructions to follow up with primary care. (Tr. 1444, 1454.)

During a November 21, 2019 orthopedic appointment, a six-week follow up to a right distal radius fracture, Ms. Tharp complained of right upper extremity numbness and tingling. (Tr. 1971.)  Orthopedist Scott Ciaccia, D.O., noted she had not been working aggressively on her range of motion, either alone or with physical therapy.  (*Id*.)  He described her as pleasant and cooperative, with good insight into her condition, and a right carpal tunnel steroid injection was performed.  (Tr. 1972.)  Dr. Ciaccia gave her a new referral for occupational therapy and instructed her to return in six weeks.  (Tr. 1973.)

Ms. Tharp returned to the ED for treatment of left flank pain, nausea, vomiting, and diarrhea on December 31, 2019.  (Tr. 1991.)  On examination, she was actively retching, displayed mild distress secondary to pain, with left CVA tenderness to palpation extending down to the flank and left lower quadrant.  (Tr. 1991, 1996.)  A renal ultrasound revealed bilateral

9

renal caculi and mild left hydronephrosis, consistent with a non-obstructive ureteral calculus. (Tr. 1992, 2001.)  She was treated with IV fluids, Zofran, morphine, Toradol, and Dilaudid, with significant improvement in her pain.  (Tr. 1992, 1997.)  She was discharged with a prescription for Percocet and Zofran, and instructions to follow up with Dr. Reese in a few days.  (*Id*.)

Ms. Tarp returned to the ED for treatment of hemoptysis, headache and respiratory distress on January 21, 2020.  (Tr. 2015.)  Physical, neurological and psychological examination results were in the normal range.  (Tr. 2021-22.)  She was diagnosed with flu and prescribed Tamiflu, prednisone, and Mucinex.  (Tr. 2025.)

### 2.     Treatment History for Mental Impairments

#### i.      Prior to Relevant Period

Ms. Tharp initiated treatment with the Charak Center for Health and Wellness ("Charak Center") in October 2015, after her former psychiatric care provider retired.  (Tr. 598.)  At her diagnostic assessment, she reported that her husband did not want her to work outside the home, and she was too anxious to work.  (Tr. 601.)  She liked to sleep to avoid thinking.  (Tr. 606.)  On examination, she displayed a disheveled appearance, depressed mood, and constricted affect. (Tr. 607.)  She was diagnosed with major depressive disorder, recurrent, severe.  (Tr. 610.)

On March 2, 2016, Ms. Tharp had a follow-up visit at the Charak Center.  She reported being out of her medications for the past three weeks, and having a difficult time leaving the house because she was taking care of a daughter who was having a mental health crisis.  (Tr. 770.)  She was advised to restart her medications and begin treatment with a counselor.  (Tr. 773.)  At a case management appointment the following week, she demonstrated fair hygiene, stable mood, and appropriate behavior.  (Tr. 768.)

### ii.    During Relevant Period

In April 2016, Ms. Tharp reported feeling stable on her current medications, but also feeling more depressed and anxious because her daughter and four grandchildren were moving in with her.  (Tr. 763.)  On examination, she was well groomed, her mood was euthymic and she had full affect.  (Tr. 764.)  Later that month, her mental status examination reflected an unkempt appearance, below average intelligence, distractable concentration, sad, depressed, and anxious mood, and flat affect.  (Tr. 757-58.)  At the end of April, Ms. Tharp reported that she had to take "clonapine"[1] to be able to come to her therapy appointment.  (Tr. 755.)

Counseling notes from May 17, 1016 note that Ms. Tharp's mood was depressed and her affect flat, but her behavior was pleasant and cooperative, and her thought processes were within normal limits.  (Tr. 752.)  The following week, her mood was "okay," with full affect and normal thought processes.  (Tr. 742.)

Ms. Tharp returned to the Charak Center on September 9, 2016, and reported she had been out of her medications – including Zoloft, buspirone, trazodone, and clonazepam – for seven days and was experiencing anxiety and depression.  (Tr. 777.)  She reported that she felt better when taking her medications as prescribed and experienced no side effects.  (*Id*.)

At a medication management appointment at the Charak Center on March 6, 2017, Ms. Tharp reported that she was sleeping and eating well, her depression was "still there but not as bad," and she had no adverse medication reactions.  (Tr. 843.)  On examination, she was well groomed and cooperative, with clear normal speech, content mood, full affect, average insight, fair judgment, and logical thought process.  (Tr. 844.)  She was continued on Rexulti, Klonopin, sertraline, and trazodone, and advised to return in a month.  (Tr. 845-46.)

---

[1]  Based on other records, she may have taken Klonopin, which had been prescribed a month earlier.  (Tr. 766.)

The following month, Charak Center counselor Susan Shefner, Psy.D. noted Ms. Tharp presented with flat affect and low energy, and was not sleeping well at night.  (Tr. 917.)  Dr. Bhandari noted she was neither improving nor getting worse, and displayed anxious mood and affect, as well as restless, agitated, pressured speech.  (Tr. 920.)  He recommended discontinuing Rexulti and adding Geodon to her existing medications.  (*Id.*)

Notes from a May 1, 2017 therapy appointment at the Charak Center state that Ms. Tharp reported a recent increase in depressive symptoms, like self-consciousness and fear of leaving the home, made it hard for her to get out of bed.  (Tr. 911.)  Dr. Shefner observed that she demonstrated low mood and flat affect.  (*Id.*)  Two weeks later, Dr. Shefner noted low mood and described her as "overwhelmed."  (Tr. 910.)  At the end of May, Ms. Tharp reported to Dr. Shefner that she was having increased anxiety regarding water and had to stop mid-shower due to a panic attack.  (Tr. 909.)

At a medication management appointment on June 5, 2017, Dr. Vinod Mhandari, M.D. noted Ms. Tharp's dosage of sertraline had recently been increased.  She reported that it helped more.  (Tr. 903.)  She had also recently resumed taking Rexulti, which she preferred to Geodon. (*Id.*)  Three days later, she returned to the Charak Center for counseling, and Dr. Shefner assessed her appearance as unkempt, her concentration as poor, her intelligence below average, her mood sad/depressed, her range of affect as restricted, and her speech as soft.  (Tr. 905.)  Dr. Shefner observed Ms. Tharp's thought process and content, judgment, insight, memory, cognition, and behavior all fell within normal limits.  (*Id.*)

At a medication management appointment on July 3, 2017, Nurse Amanda McIntosh noted Ms. Tharp continued to do well on her current medications, with no side effects, and did not want any medication adjustments.  (Tr. 895.)  She reported feeling depressed and irritable

12

due to financial and family stress.  (*Id*.)  On examination, Ms. Tharp was well groomed and cooperative, with clear normal speech, depressed anxious mood, full affect, average insight, fair judgment, and logical thought process.  (Tr. 897.)  Her medications were not changed (Tr. 895), and she was advised to return in one month (Tr. 898).

At a medication management appointment on September 7, 2017, Dr. Bhandari noted Ms. Tharp was pleasant and cooperative, less depressed and labile than he had seen her for a long time, and reported that Rexulti made her "not as moody."  (Tr. 885.)  He added 40 mg of Latuda to her existing medications and advised her to return in one month.  (Tr. 886.)

At her medication management appointment on October 11, 2017, Dr. Bhandari noted that Ms. Tharp was very flat in affect and reported feeling very depressed.  (Tr. 882.)  On October 27, 2017, Dr. Bhandari observed that Ms. Tharp's affect was brighter, despite family and financial stressors, and noted that Latuda seemed to have made a difference.  (Tr. 878.)  He reported he would discontinue Rexulti.  (*Id.*)

On November 27, 2017, Ms. Tharp returned to the Charak Center and reported that Latuda was making her less irritable, less emotional and less tearful, but that she had run out of all her medications about ten days prior.  (Tr. 2146.)  She reported feeling depressed and preferred to stay in bed rather than deal with life.  (*Id*.)

At a Charack Center appointment in December 2017, Ms. Tharp reported that she was not as depressed on Latuda.  Dr. Bhandari observed she was not as flat in affect. (Tr. 2157.) Later that month, Dr. Bhandari noted her affect was stable, her medications were working, and she reported no side effects.  (Tr. 2152.)

At a March 28, 2018 medication management appointment, Dr. Bhandari noted Ms. Tharp had bright affect and was doing well on her medications but had gained 23 pounds.  (Tr.

2106.)  Ms. Tharp returned to Dr. Bhandari on February 6, 2018, and reported "she is a little bit better on medications than not."  (Tr. 2110.)  He noted she was somewhat overtalkative, with mixed affect, and increased her dosage of Latuda.  (*Id*.)

At an April 26, 2018 psychiatric medication management appointment, Nurse Practitioner Stephanie Harris noted Ms. Tharp had some mild depression and anxiety, but was sleeping and eating well, with no side effects from her medications.  (Tr. 2097.)  She recommended a follow up in two months.  (*Id*.)

After being denied Social Security benefits in May 2018, Ms. Tharp reported financial stress and more depression at her follow up medication management appointment on June 26, 2018.  (Tr. 2093.)  She was tearful and stated, "I crawl on the couch and sleep my life away." (*Id*.)  Dr. Bhandari increased her dosage of Latuda.  (*Id*.)  The following month, Dr. Bhandari noted Ms. Tharp was somewhat better on an increased dosage of Latuda, but was still depressed and afraid to go out, with poor concentration, poor appetite, and oversleeping.  (Tr. 2102.)  He observed she had very flat affect and planned to initiate treatment with Lamictal.  (*Id*.)  In August 2018, Ms. Tharp reported she was no better, but Dr. Bhandari noted significant family stressors.  He observed her affect was slightly better and brighter, and she was compliant with her medications.  (Tr. 2074.)  He increased her dosage of Lamictal.  (*Id*.)

Ms. Tharp had to discontinue Lamictal due to a rash in October 2018.  (Tr. 2078.)  Dr. Bhandari noted that she continued to report significant depression and increased her dosage of Latuda to compensate.  (*Id*.)  In November 2018, medication management notes indicate Ms. Tharp discontinued Latuda due to weight gain.  (Tr. 2086.)  She reported that without mood stabilizers, her mood had crashed.  (*Id*.)  Dr. Bhandari observed she had flat affect and decided to try Trintellix in place of Zoloft.  (*Id*.)  The following month, she reported her mood was better on

14

Trintellix, but people around her said she was more "mean." (Tr. 2089.)  Dr. Bhandari observed she was more verbal, with brighter affect, and increased her dosage on Trintellix.  (*Id.*)

Ms. Tharp attended a psychiatric medication management appointment at the Charak Center on April 24, 2019 with her daughter, and reported that she felt like she was going through a midlife crisis, having left her husband and then returned to him.  (Tr. 2114.)  She also reported that she had stopped taking all her medications and then resumed Vraylar and Klonopin.  (*Id.*)  The next month she reported noticing no difference with an increase in Zoloft and believed medications could not help where she was now.  (Tr. 2120.)  Physician Assistant Mikaela Pope observed she was well groomed, with depressed, anxious mood, labile affect, logical thought processes, and impaired memory.  (Tr. 2020-21.)

On August 9, 2019, Ms. Tharp returned to the Charak Center, and reported she felt a little less irritable, but otherwise no different, with continued depressed mood and a lack of motivation that made it hard for her to get up and care for herself and her home.  (Tr. 2039.)  On examination, she was well groomed and cooperative, with depressed and anxious mood, labile affect, impaired attention and concentration, and impaired memory.  (Tr. 2040-41.)  Her thought process, thought content, judgment, insight, memory, cognition, and behavior all fell within normal limits.  (*Id.*)  Her psychiatric medications included Klonopin, melatonin, Zoloft, zonisamide, and Effexor.  (Tr. 2042.)  Vrayler was added to her medications.  (Tr. 2048.)

The following month, Ms. Tharp returned to the Charak Center and reported that "Vraylar is helpful for her…motivation is improved… mood is a little more stable but is still having some depression." (Tr. 2045.)  Physician Assistant Aubrey Winkler noted that Ms. Tharp would restart therapy once the Charak Center got a female provider on staff.  (Tr. 2049.)

Ms. Tharp reported a regression in November of 2019, after she ran out of Zoloft.  (Tr. 2050.)  She reported "not feeling herself," with severe depression, anxiety, panic attacks, and racing thoughts, and fighting more with family.  (*Id*.)  On examination, she was well groomed and cooperative, with depressed, anxious, irritable mood, labile affect, impaired memory, and logical, circumstantial thought processes.  (Tr. 2051-52.)

### 3.      Opinion Evidence

#### i.      Consultative Examination

On August 20, 2014, years prior to the alleged onset date, consultative examiner Khalid Darr, M.D. examined Ms. Tharp at the request of the state agency and assessed no exertional limitations.  (Tr. 580-87.)  His examination showed normal muscle strength in the extremities, normal gait and range of motion, and the ability to squat, perform a tandem walk, and walk on heels and toes.  (*Id*.)  Ms. Tharp also demonstrated normal communication skills, normal intellectual function, and good recent and remote memory for medical events.  (Tr. 581, 583.)

#### ii.      Function Reports

Ms. Tharp completed a Function Report on April 28, 2016 with the assistance of a case manager.  (Tr. 339-46.)  She stated that she had difficulty leaving the house due to: severe anxiety; social anxiety that limited her ability to be around people, especially men; and panic attacks that prevented her from getting in water to bathe.  (Tr. 339-40.)  She also reported difficulty reading and understanding simple concepts, and sometimes going days without eating.  (*Id*.)  On good days, she would help care for her grandkids and prepare meals such as sandwiches and cereal.  (Tr. 340-41.)  On bad days, she would just pace the house and clean, but could not finish what she started due to a "demon" that interrupted and stopped her concentration.  (Tr.

340, 342.)  She drove and shopped for food and necessities when she had to, but sometimes had to abandon the shopping due to a panic attack.  (Tr. 342.)

Ms. Tharp submitted a personal statement in response to the Notice of a Hearing mailed to her on April 4, 2017.  (Tr. 372-79.)  She explained her financial need, and noted she was taking Hemoplegia for facial spasms, as well as Klonopin, Zoloft, Rexulti, and PTSS.  (*Id*.)

Shane Butler, her daughter's boyfriend, completed a Third Party Function Report on March 17, 2020.  (Tr. 406-13.)  He stated that he had known Ms. Tharp for three years and saw her daily.  (Tr. 406.)  He reported she did not leave the house, slept her depression away, and needed help 24 hours a day, including to use the restroom, bathe, dress, care for her hair, shave, and take her medications.  (Tr. 406-07.)  He reported that her husband and daughter took care of the house and her meals, and that she shopped very little and with her husband's assistance.  (Tr. 408-09.)  She needed someone to accompany her "seriously all the time" when she went out, and only went to church or appointments.  (Tr. 410.)

Ms. Tharp's pastor, Dr. Marius E. Marton, wrote a letter dated June 23, 2017, in which he described meeting Ms. Tharp in the hospital when she was admitted for hernia surgery, and providing pastoral counseling to her since that time.  (Tr. 371.)  Dr. Marton stated Ms. Tharp had physical impairments including facial spasm which made it difficult for her to read or use a computer, and spiritual and mental impairments including claustrophobia, panic attacks and anxiety, which made it hard for her to do attend doctor's appointments, shower, and drive.  (*Id*.)  He stated she reported needing reminders to take her medications and dress herself.  (*Id*.)

### iii.  Opinions of Treating Providers

Postdoctoral fellow Susan Shefner, Psy.D., and her clinical supervisor, Matthew Paris, Psy.D., wrote a letter dated June 12, 2017, which was co-signed by psychiatrist Vinod Bhandari,

M.D. on June 15, 2017. (Tr. 870.) The doctors stated that Ms. Tharp received individual therapy and medication management at the Charak Center to address symptoms of bipolar disorder and PTSD. (*Id*.) Her therapy appointments were described as weekly or bi-weekly. (*Id*.)

An unidentified source at the Charak Center completed a questionnaire for the State Agency in June 2016, which stated Ms. Tharp had distraught thought content, sad and depressed mood, inattention most days, daily mood swings, sleep problems, traumatic stress, anger and aggression towards her family, and social anxiety when around crowds or the outside world, which had persisted since at least 2010 and possibly earlier. (Tr. 595-96.)

A letter from Physician's Assistant Mikaela Pope at the Charak Center dated December 3, 2019 reported that Ms. Tharp was being treated for bipolar disorder and chronic PTSD, and had been in compliance with all appointments, medications, and overall treatment. (Tr. 1259.)

### iv. State Agency Reviewers

On June 22, 2016 state agency reviewing physician Abraham Mikalov, M.D., reviewed the record and opined that Ms. Tharp did not have a severe physical impairment, although non-severe impairments of osteoarthritis, hemolytic anemias, hernias, and asthma caused minimal impairment. (Tr. 140-41.)

On June 27, 2016, state agency reviewing psychologist Cynthia Waggoner, Psy.D., reviewed the record and opined that Plaintiff had moderate mental limitations as follows:

- ability to carry out detailed instructions,

- ability to maintain attention and concentration for extended periods,

- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms,

- ability to perform at a consistent pace without an unreasonable number and length of rest periods,

- ability to interact appropriately with the general public, and

- ability to respond appropriately to changes in the work setting (Tr. 143-145).

Both the physical and mental RFC determinations were adopted on reconsideration. (Tr. 155-60.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

#### i.    December 2017 Hearing

At the first hearing, on December 12, 2017, Ms. Tharp testified that she lived with her husband and two daughters, ages fifteen and three.  (Tr. 53.)  She didn't keep in touch with any other family members or have friends.  (Tr. 57.)  She had four older children who lived outside the home.  (Tr. 65.)  She spoke with them on the phone and they sometimes came to visit with her eight grandchildren.  (Tr. 66.)  Her daughter attended ninth grade online through ECOT, and any teacher conferences were over the phone.  (Tr. 54.)

With regard to activities of daily living, her husband and older daughter did most of the chores, including all of the cooking and cleaning.  (Tr. 53.)  She sometimes did the dishes or folded clothes.  (*Id*.)  After her husband's back surgery, her daughter had to pick up extra chores. (Tr. 54.)  All she did was stay in bed, although she didn't always sleep.  (Tr. 58.)  Her three year old would lay in bed and cuddle with her, but would go to her sister if she needed anything.  (Tr. 63.)  When Ms. Tharp had mania, she reported she would go crazy cleaning, but that only happened once in a while.  (Tr. 61.)  She had to medicate herself to take a shower, because it gave her panic and anxiety attacks.  (Tr. 68.)

She had never worked and belonged to no clubs or groups.  (Tr. 57.)  She liked to listen to sermons over the internet but did not read devotional materials because they were hard for her

to read and understand.  (*Id*.)  She had a history of sexual abuse that resulted in PTSD, and was therefore uncomfortable around men.  (Tr. 68-69.)

She last drove a week prior to the hearing, to go to a doctor's appointment.  (Tr. 54.)  She rarely drove because her facial spasms made it difficult.  (*Id*.)  Her facial spasms were related to stress.  (Tr. 74.)  She had not been to church for a couple of months because she had been having problems leaving the house.  (Tr. 55.)  She took Klonopin on a daily basis to help with anxiety, and had to take extra medication to leave the house.  (Tr. 59.)

### ii.  April 2020 Hearing

At her second hearing, on April 22, 2020, Ms. Tharp testified that she was unable to work because she had a hard time leaving the house due to really bad anxiety and panic attacks, and could not socialize with people due to her PTSD.  (Tr. 88.)  She had been in a manic state since December because she had lost her insurance and could not afford treatment.  (Tr. 88-89.)  Prior to that, she received treatment at the Charak Center once or twice a month.  (Tr. 89.)  She reported that they kept changing her medications but were never able to find a combination of medications and treatments that allowed her to function enough to work full-time.  (Tr. 90.)  She used to blame her poor focus and concentration on her medications, but said they remained very poor when she went off her medication.  (Tr. 94.)

With regard to activities of daily living, her seventeen-year-old daughter and her daughter's nineteen-year-old boyfriend did all of the household chores.  (Tr. 95.)  She could not even brush her own hair, grasp a pencil, or wipe herself because she could not close her right hand.  (Tr. 95, 97.)  Her daughter helped her do all of those things.  (*Id*.)

She broke her wrist in October when she went to a roller arena for her granddaughter's birthday and tried to show her five-year-old how to skate.  (Tr. 91.)  She had taken a double dose

20

of Klonopin to be able to attend the birthday, and still felt like a nervous wreck while she was

there.  (Tr. 92.)  After the initial surgery, she did some physical therapy, but had to stop because

she lost her insurance.  (Tr. 97-98.)  She thought the surgery was not right because her hand felt

numb and dead all the time.  (Tr. 98.)

In a typical week, she rarely left the house unless she had a doctor's appointment.  (Tr.

92-93.)  The last time she had left her house was when she went for hand therapy in November.

(*Id*.)  She always took a double dose of Klonopin when she went out, which clouded her vision.

(Tr. 93.)  A year prior, she had a breakdown and drove herself three hours away from her home,

but could not remember how she got there or find her way back.  (*Id*.)

## 2.    Vocational Expert's Testimony – April 2020

At the April 2020 hearing, a Vocational Expert ("VE") testified.  (Tr. 99.)  The VE

testified that the hypothetical individual of Ms. Tharp's age, with no vocational relevant work

background and the function limitations described in the ALJ's RFC determination could

perform representative positions in the national economy, including office cleaner, food service

worker, or packager.  (Tr. 99-100.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[2]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his May 6, 2020 decision, the ALJ made the following findings:[3]

1.  The claimant has not engaged in substantial gainful activity since March 8, 2016, the alleged onset date.  (Tr. 13.)

2.  The claimant has the following severe impairments: bipolar disorder with depression, post-traumatic stress disorder (PTSD), morbid obesity, status post open reduction with internal fixation of recent right distal radial fracture with carpal tunnel syndrome (CTS), hernia, and asthma.  (*Id.*)

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

4.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except for no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; frequent handling and fingering with the right upper extremity without limitation of the left; no concentrated exposure to temperature extremes, humidity or environmental pollutants; no exposure to hazards (heights, machinery, commercial driving); and mental limitations that the claimant perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation or confrontation), and no interaction with the public as a job requirement.  (Tr. 16.)

5.  The claimant has no any past relevant work.  (Tr. 21.)

6.  The claimant was born in 1970 and was 46 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age upon her attainment of age 50 in 2020.  (*Id.*)

7.  The claimant has at least a high school education and is able to communicate in English.  (*Id.*)

---

[3] The ALJ's findings are summarized.

8.    Transferability of job skills is not an issue because the claimant has no past relevant work.  (*Id.*)

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including office cleaner, food service worker, and packager.  (Tr. 21-22.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 8, 2016, through the date of the decision on May 6, 2020.  (Tr. 22.)

## V. Plaintiff's Arguments

In her Brief, Ms. Tharp challenges the constitutional authority of the Commissioner to decide her case, and raises a substantive objection to his decision as follows:

1.    The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective. (ECF Doc. 14 p. 1.)

2.    The ALJ committed harmful error when he failed to include kidney stones as a severe impairment and failed to find that Tharp was disabled at Step Three of the Sequential Evaluation. In the alternative, the ALJ erred in forming the RFC when he failed to properly evaluate the evidence documenting the combination of Tharp's severe impairments.  (*Id.*)

## VI. Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.  Whether ALJ Decision Was Constitutionally Defective

The undersigned recommends remand on substantive grounds, for the reasons explained in Sections VI.C.1. and VI.C.3., *infra*.  The doctrine of constitutional avoidance instructs this Court not to reach constitutional issues unless it must do so.  *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936).  Accordingly, the undersigned will not reach the Constitutional separation of powers argument raised by Ms. Tharp in this case.

## C.  Whether ALJ Decision Was Substantively Defective

Under the umbrella of what is described as a single assignment of error, Ms. Tharp has attempted to raise numerous discrete and unrelated arguments in a manner that is neither clear nor appropriately developed.  (ECF Doc. 14 pp. 12-23.)  While the undersigned has undertaken to parse out those arguments that meet at least the bare minimum of requirements to identify an issue for determination by this Court, it is noted that:

> [I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.

*McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997); *see also Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul,* No. 1:19-CV-

01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).  This report and recommendation will not address issues simply referenced in passing, without an appropriately developed argument.

Upon review of Ms. Tharp's brief, the undersigned has determined that the following issues were sufficiently identified and argued: (1) whether the ALJ committed harmful error by finding Ms. Tharp's kidney stones were a non-severe impairment (ECF Doc. 14 pp. 12-14); (2) whether the ALJ's listing analysis was supported by substantial evidence (*id.* at pp. 15-18); (3) whether the ALJ properly evaluated the opinion evidence (*id*. at p. 18-23); and (4) whether the ALJ properly assessed the combined effects of Ms. Tharp's impairments (*id*. at p. 18).  Each of these arguments will be addressed in turn below.

Any other issues identified by Ms. Tharp were raised in a perfunctory manner, without developed argument, and are therefore deemed waived.  *McPherson*, 125 F.3d at 995–96. Counsel is strongly cautioned that the continued practice of briefing cases in this unclear and underdeveloped manner may result in further waiver of arguments on appeal.

### 1.    Whether ALJ Committed Harmful Error at Step Two

Ms. Tharp's first substantive argument is that the ALJ committed harmful error by failing to identify her recurrent kidney stones as a severe impairment.  (ECF Doc. 14 pp. 13-14; ECF Doc. 17 p. 1.)  She contends that the ALJ mischaracterized the medical records by stating that "much of her treatment was before the alleged onset date," pointing out that the records actually show "multiple emergency room visits and several surgeries since her alleged onset date."  (ECF Doc. 14 p. 14.)  She argues that the "multiple occurrences of her kidney stones offer more than *de minimus* evidence of an impairment which affected her ability to engage in substantial gainful activity on a sustained and full-time basis," as her kidney stone episodes would have likely caused her to be absent from work.  (*Id*.)

The Commissioner responds that it does not matter whether the ALJ labeled Ms. Tharp's kidney stones as severe or non-severe "so long as [he] considered the limitations as demonstrated by the relevant evidence," and argues that the ALJ met this harmless error standard when he found other impairments severe and "continued through the sequential evaluation process to consider her non-severe impairments in combination with her severe impairments." (ECF Doc. 16-1 p. 23.) Moreover, the Commissioner argues that Ms. Tharp failed to meet her burden to show reversible error at Step Two because the ALJ's decision to classify the impairment as non-severe was supported by substantial evidence. (*Id.* at pp. 23-24.)

It is undisputed that Ms. Tharp bears the burden of showing the severity of her impairments. *Foster v. Sec'y of Health & Human Svcs.*, 899 F.2d 1221, 1990 WL 41835 at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986)). A "severe" impairment is "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

The Sixth Circuit has construed Step Two as a *de minimis* hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)). Although the standard is *de minimis*, it is recognized that a diagnosis alone "says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere

28

existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

The Commissioner is correct that the Sixth Circuit has sometimes held, in cases where an ALJ identified both severe and non-severe impairments, that a determination that a specific impairment was non-severe was not reversible error when the Commissioner could still consider the non-severe impairment in assessing the RFC at Step Four.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (finding it "legally irrelevant" that some impairments were not deemed severe where the designation of other impairments as severe "cleared step two of the analysis" and thus caused the ALJ to consider both "severe and nonsevere impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment at step two).

However, the Sixth Circuit also found that this harmless error standard is inapplicable when an ALJ has failed to consider the relevant impairment in assessing the RFC.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190-91 (6th Cir. 2009) (finding reversible error when ALJ found nonsevere mental impairments "would not be considered in assessing her RFC"); *see also Miller v. Kijakazi*, No. 2:20-CV-013, 2021 WL 3494563, at *6 (E.D. Tenn. Aug. 9, 2021) (finding failure by ALJ to discuss Plaintiff's vision impairments at Step Two or in the RFC determination "was not harmless because she did not consider these impairments in the RFC determination"); *Rose v. Comm'r of Soc. Sec.*, No. 2:14-CV-1901, 2015 WL 6735313, *5 (S.D. Ohio Nov. 4, 2015) (finding harmless error analysis "is appropriate only when the ALJ properly considered any functional limitations arising from non-severe impairments when crafting his

29

residual functional capacity finding"), *report and recommendation adopted*, 2015 WL 7779300
(S.D. Ohio Dec. 2, 2015); *Pompa*, 73 F. App'x at 803 (applying harmless error standard where
"ALJ considered all of [Ms. McCormick]'s impairments in her residual functional capacity
assessment finding").

The Commissioner argues that the ALJ in this case "continued thought the sequential
evaluation process to consider [Ms. Tharp's] non-severe impairments in combination with her
severe impairments."  (ECF Doc. 16-1 p. 23.)  However, the Commissioner has not identified
specific language in the ALJ decision which states that he considered limitations associated with
her kidney stones in assessing the RFC, and the undersigned was unable to independently locate
language to this effect.  There is no language in the Step Two analysis indicating that the ALJ
considered the non-severe impairments in assessing the RFC, only general findings that the non-
severe impairments "do not significantly limit the claimant's ability to perform basic work
activities" and will not "more than minimally affect her ability to work full-time."  (Tr. 13.)
There is likewise no language in the Step Four analysis indicating that the ALJ considered the
impact of this non-severe impairment on Ms. Tharp's RFC.  (Tr. 16-21.)  Given the ALJ's failure
to clearly state that he considered the impact of Ms. Tharp's kidney stones on her RFC, the
undersigned cannot find that the above harmless error standard applicable in this case.

The Commissioner nevertheless contends that there is no harmful error because the ALJ's
finding that Ms. Tharp's kidney stones were non-severe was supported by substantial evidence.
In support of this finding, the ALJ explained:

> The claimant has also been treated for recurrent urethral calculi and underwent
> successful stone extraction and stent placement (Ex. B20F/18, 53).  Much of her
> treatment relating to the kidney stones predates the claimant's the alleged onset
> date.  The claimant did not indicate that this causes her more than minimal
> limitation and the claimant has not been assigned any work limitations as a result
> of this impairment. … The record generally reflects little treatment regarding [the

non-severe] impairments and does not indicate that [they] cause[] her more than minimal limitation.

(Tr. 13.)  As the Commissioner acknowledges, the only medical records cited by the ALJ reference treatments in January and August 2016. (ECF Doc. 16-1 p. 24 (citing Tr. 13, 1027, 1062).)  The Commissioner then suggests that the ALJ was accurate in stating that much of Plaintiff's treatment for kidney stones predated her alleged onset date, arguing that she "required no treatment for kidney stones between August 2016 and February 2019" except for a flare in November 2016 where she "refused to transfer to urology for further treatment" and "a few identifications of possible non-obstructing stones."  (*Id.*)

Upon a review of the underlying medical records, the undersigned finds that neither the ALJ nor the Commissioner have accurately characterized the records relating to Ms. Tharp's treatment for kidney stones during the relevant period.  The ALJ's finding that much of Ms. Tharp's treatment preceded the alleged onset date creates an inaccurate implication that she did not receive significant treatment after August 2016, and the Commissioner's more detailed description of the evidence subsequent to August 2016 understates the findings and treatment.

In November 2016, Ms. Tharp did not simply appear for a single treatment visit where she refused transfer to urology, as suggested by the Commissioner.  (ECF Doc. 16-1 p. 24.)  Instead, she made three separate visits to the ED for treatment of pain and nausea, and attended a follow up appointment with urology.  (Tr. 1312, 1757, 1776, 1799.)  Imagery confirmed kidney stones and an obstructing calculus of the left ureter with hydroureteronephrosis.  (Tr. 1764, 1786, 1810-11.)  She was treated with medication, and her urologist planned an ESWL procedure.  (Tr. 1313, 1764-66, 1781, 1804-05.)

The Commissioner's further assertion that her subsequent treatment was limited to "a few identifications of possible non-obstructing stones" is also inaccurate.  (ECF Doc. 16-1 p. 24

(citing Tr. 1709, 1732, 2004).)  In the first of the cited visits, in January 2017, a CT revealed a left ureteral calculus causing hydronephrosis and hydroureter, as well as kidney stones consistent with medullary nephrocalcinosis.  (Tr. 1742-44.)  Ms. Vaughn was prescribed Percocet and Phenergan at the ED (Tr. 1738, 1744), followed up with her urologist the same day (Tr. 1309-11), was noted to be in continued pain since recently passing stone fragments (Tr. 1309), and underwent a cystoscopy and ureteroscopy two weeks later due to continued complaints of severe pain (Tr. 1059-60, 1351-52).  She was treated with medications at the other two ED visits cited by the Commissioner, in February 2017 and October 2018.  (Tr. 1714, 1718, 2005.)

Additional treatment visits that were not acknowledged by the ALJ or the Commissioner included numerous ED treatment visits for flank pain, such as one in January 2019 and three in February 2019 (Tr. 1514, 1517-18, 1538, 1542, 1565, 1568, 1616, 1620), with CT imaging confirming an obstructing stone of the left ureter and bilateral intrarenal calculi on February 19, 2019 and nonobstructing bilateral renal stones and multiple calcifications in the pelvis on February 23, 2019 (Tr. 1525, 1577).  Ms. Tharp was ultimately admitted to the hospital in February 2019 and underwent surgery to remove a left ureteral calculus and insert a stent at the end of February, with a follow-up surgery in March 2019.  (Tr. 1493-96.)  She returned to the ED for abdominal pain in March 2019, with a CT revealing bilateral non-obstructing nephrolithiasis, and was treated with medications.  (Tr. 1438-55.)  She again returned to the ED in December 2019, complaining of flank pain, nausea, and vomiting, with an ultrasound revealing bilateral renal calculi and hydronephrosis consistent with a non-obstructive ureteral calculus, and was treated with medications.  (Tr. 1991-97, 2001.)

The implication of the ALJ's language in finding Ms. Tharp's kidney stones non-severe was that she had received little or no treatment since August 2016, with most treatment for the

impairment occurring prior to the alleged onset date.  This is not consistent with treatment records showing recurrent problems with kidney stones throughout the relevant period, with multiple ED visits and a hospital admission, supporting imagery, specialty treatment with urology, pain medications, and numerous surgical procedures.  The Commissioner's argument that the non-severe finding is supported by substantial evidence is similarly tainted by inaccurate descriptions of the underlying records.  As numerous courts have previously held, a finding that relies on a mischaracterization of the facts is not supported by substantial evidence. *See Simpson*, 344 F. App'x at 190-191 (finding ALJ lacked substantial evidence to find plaintiff had no mental limitations after relying on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787–88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support no mental limitations after mischaracterizing evidence and misstating doctor's findings).

The Commissioner argues that the ALJ's non-severe finding was appropriate because he also relied on Ms. Tharp's own testimony and the medical opinion evidence.  (ECF Doc. 16-1 p. 24 (citing Tr. 13, 132-47, 149-63, 331).)  It is evident from the record that Ms. Tharp's application for benefits largely focused on her mental impairments (Tr. 88, 331, 339, 350), although she did testify at her December 2017 hearing that she had experienced kidney stones "about three times a year" for the past twenty-two years (Tr. 72).  It is also evident that the state agency reviewing physicians determined in June and October of 2016 that Ms. Tharp had no severe physical impairments.  (Tr. 140, 155-56.)

While these are factors that certainly may be considered in a substantial evidence analysis, it is noted that Ms. Tharp did ultimately testify and provide evidence regarding her kidney stones.  It is further noted that the state agency opinions relied on the same 2016 treatment records that were cited by the ALJ in support of his non-severe finding, and were

rendered before any of the subsequent treatment discussed above.  The ALJ's reliance on these opinions suffers the same defect as his mischaracterization of the medical evidence, as his failure to acknowledge the hospital visits and procedures post-dating the opinions undermines his reliance on the opinions.  *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (finding an ALJ "'must give some indication' that he 'at least considered' that [a non-treating medical] source did not review the entire record" when affording weight to that opinion) (quoting *Blakley*, 581 F.3d at 409) (internal citations omitted); *Patterson v. Comm'r of Soc. Sec.*, No. 1:16cv110, 2017 WL 914272 at *10 (N.D. Ohio Mar. 8, 2017) ("ALJ may rely on a state agency reviewer who did not review the entire record, so ... long as the ALJ also considers the evidence post-dating the opinion.").

As noted above, "[s]ubstantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030.  In considering this standard, it must also be considered whether the reasoning given fails to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Where an ALJ's stated reasons for making a determination are inaccurate or based on a mischaracterization of the evidence, it has repeatedly been held that the ALJ failed to build an accurate and logical bridge between the evidence and the result.  *See, e.g., Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL 2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

Here, the ALJ's statement that "[t]he record generally reflects little treatment regarding [the kidney stones]" is simply inaccurate, and the ALJ's failure to acknowledge the evidence subsequent to the state agency reviewers' decisions make it impossible to conclude that he considered the record as a whole.  Therefore, the undersigned cannot conclude that the ALJ's failure to classify kidney stones as a severe impairment at Step Two was supported by substantial evidence or harmless error.  *See Biehl v. Comm'r of Soc. Sec.*, No. 14-10293, 2015 WL 736366, at *21 (E.D. Mich. Feb. 20, 2015) ("[B]ecause it is at best unclear whether the ALJ considered plaintiff's mental impairment in determining her RFC, the court cannot conclude that the ALJ's finding is supported by substantial evidence.").

Accordingly, for the reasons set forth in further detail above, the undersigned recommends that the case be remanded to allow the ALJ an opportunity to address whether Ms. Tharp's kidney stones are a severe or non-severe impairment, which finding should be supported by a complete and accurate review of the medical evidence and should explicitly address the impact of that impairment, if any, on her RFC limitations.

### 2.    Whether Listings Analysis for Mental Impairments at Step Three Was Supported by Substantial Evidence

Ms. Tharp next challenges the ALJ's determination that she did not meet or medically equal Listings 12.04 or 12.15 at Step Three of the sequential evaluation.  (ECF Doc. 14 p. 15; ECF Doc. 17 p. 2.)  These Listings deal with the following mental disorders: depressive, bipolar and related disorders (12.04), and trauma- and stressor-related disorders (12.15).  C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04, 12.15.  Ms. Tharp asserts that the ALJ's basis for this determination was contrary to the evidence of record, and that his analysis misstated the evidence.  (ECF Doc. 14. p. 15.)  She also argues that the ALJ failed to address any evidence that would support a finding of disability.  (*Id*. at p. 18.)

At the outset, the Court notes that Ms. Tharp supports this argument with a two-page, string-cite recitation of evidence, and offers no analysis of how this evidence is connected to the Listing criteria which she challenges, beyond the blanket statement that "[t]he actual evidence, as documented above, indicated that Tharp was seriously limited in her ability to function independently, appropriately, effectively, and on a sustained basis in all four of the 'B' criteria." (*Id*. at p. 16.)  She does not identify the evidence she believes the ALJ misstated, nor explain the basis for that assertion.  As the Commissioner notes, this is contrary to the Sixth Circuit's requirement that "[w]hen a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. Soc. Sec. Admin*., 93 F. App'x 725, 728 (6th Cir. 2004). Nevertheless, the merits of the argument are addressed herein.

Both of the Listings at issue here incorporate identical paragraph B and paragraph C criteria, which is an analysis used to rate the severity of mental impairments in four general areas of functioning at Steps Two and Three of the sequential evaluation process.  20 C.F.R. Pts. 404, 416.  Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a listing.  20 C.F.R. § 416.920a(c)(3), *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00E.  As Ms. Tharp's argument focuses on the "B" criteria, those are the criteria that will be addressed herein.

Notably, the inquiry required here is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment.  *See*

*Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  The ALJ determined that Ms. Tharp had moderate limitation in all four of the "B" criteria, with the following additional explanation:

- With regard to understanding, remembering, or applying information, the ALJ noted that Ms. Tharp "reported bouts of confusion," but treatment notes described her as "alert and oriented in all spheres" (Tr. 15 (citing Tr. 742, 752, 864)), with "no memory loss and a normal, logical thought process" (*id.* (citing Tr. 742-43, 749, 769, 770, 778, 787)), "insight and judgment … listed from fair average to good," and intelligence "described as below average to average" (*id.* (citing Tr. 769, 771, 778, 864, 903)).

- As to interacting with others, the ALJ noted Ms. Tharp reported she did "not stay in touch with family or friends" and alleged "high levels of anxiety," but was "able to rely on her daughters for support" (*id.* (citing Tr. 901)).  He explained that treatment notes described her as "pleasant, cooperative, articulate, and insightful" (*id.* (citing Tr. 742, 752; 778, 842)), but also showed her to "struggle with irritability" (*id.* (citing Tr. 931)).

- With regard to concentrating, persisting, or maintaining pace, the ALJ noted Ms. Tharp reported "an inability to stay focused for extended periods of time," with "[t]reatment notes reflect[ing] mildly to moderately impaired concentration" (*id.* (citing Tr. 743, 749)) and distractibility (*id.* (citing Tr. 757)), but also sometimes described her concentration as normal.

- With regard to adapting or managing oneself, the ALJ noted that Ms. Tharp "reported experiencing panic attacks" and that "anxiety prevents her from driving long distances and occasionally even bathing herself" (*id.* (citing Tr. 748, 870)), in addition to reporting "sleep disturbances at times" and "that her anxiety has led to suicidal ideation in the past" (Tr. 15-16 (citing Tr. 770, 904)).  However, he noted that other treatment notes "report the claimant to have no hallucinations, intrusive thoughts, suicidal ideation or sleep disturbances" (Tr. 15 (citing Tr. 743-44)), and that Ms. Tharp "reported improved psychiatric symptoms when taking her medications as prescribed" (Tr. 16 (citing Tr. 777)).  He also noted that Ms. Tharp's daily activities included "playing with her children, grandchildren, and pets, going shopping, doing chores, and attending church on occasion (*id.* (citing Tr. 341-43, 843, 901)), and that she did not have "any inpatient psychiatric hospitalizations during the relevant period" (*id.*).

The ALJ also properly relied on the opinions of the state agency reviewing psychiatrists (Tr. 148, 164) to support the conclusion that Ms. Tharp did not meet or medically equal a Listing. *See Jones v. Comm'r of Soc. Sec*., 2012 WL 946997 at *8 (N.D. Ohio Mar. 20, 2012) (an ALJ "is permitted, even encouraged, to rely on a medical expert for a professional medical analysis of whether . . . a claimant meets or equals a listing.")  Ms. Tharp points out that these reviewers rendered their opinions more than three years prior to the ALJ's decision.  (ECF Doc. 17 p. 2.)  However, it is well-settled that an ALJ may rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating his opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (finding an ALJ's reliance on outdated state agency reviewing physicians' opinions was not error where ALJ also considered the evidence post-dating those opinions).

Here, the ALJ cited and discussed a significant amount of more recent mental health evidence in his decision, including treatment notes from 2017 (Tr. 18 (citing Tr. 843, 903)), 2019 (*id*. (citing Tr. 2039-40, 2045, 2050)), and 2020 (*id*. (citing 2016)).  As the Sixth Circuit explained, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."  *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 508 (6th Cir. 2006); *see also Dykes ex rel. Brymer v. Barnhart,* 112 F. App'x 463, 467–68 (6th Cir. 2004) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (citations omitted)).  Although the ALJ did not specifically address every piece of evidence in the record, his factual findings reveal that he considered the record as a whole.

The undersigned concludes that the ALJ's findings with respect to the mental Listings was supported by substantial evidence.  Ms. Tharp argues that other evidence supports a more restrictive level of limitation for all of these criteria.  (ECF Doc. 14 p. 16.)  However, this Sixth Circuit has made clear that, "[u]pon a finding that there is substantial evidence to support the ALJ's findings, we must affirm, and may not "even inquire whether the record could support a decision the other way." *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 466 (6th Cir. 2017)*, quoting Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (quoting *Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989)).  Ms. Tharp's argument that the ALJ failed to acknowledge evidence supporting a finding of disability is not well taken, as the ALJ noted and acknowledged: (1) evidence of impairment supporting moderate limitation in all four of the "B" criteria (Tr. 15-16); (2) diagnoses of depression, anxiety, bipolar disorder and PTSD, which were treated at various times with Zoloft, Buspar, Latuda, Trazadone, and Klonopin (Tr. 18); and (3) Ms. Tharp's reports that anxiety limited her driving (Tr. 15) and made it difficult to complete activities of daily living or leave the house (Tr. 16-18).

Having compared the evidence cited and described in Ms. Tharp's brief (ECF Doc. 14 pp. 15-16) to the evidence cited and relied upon by the ALJ in support of his Step Three findings, the undersigned was unable to independently identify any of the misstatements of evidence alluded to but not specifically described by Ms. Tharp.  The only evidence she cited that was clearly not addressed by the ALJ is a January 29, 2019 neurological evaluation for complaints of right-sided weakness and facial drooping, memory loss, and blackouts.  (*Id.* at p. 16 (citing Tr. 1300).)  This evaluation was undertaken in the context of a January 26, 2019 brain MRI with findings suggestive of intracranial atherosclerosis or other small vessel narrowing, or a demyelinating or post inflammatory process (Tr. 1300, 1607-08).  On examination, Ms. Tharp

had normal cognitive function, but with decreased sensation and vibratory sense on the right side

of her face and the right upper and lower extremities.  (Tr. 1301-02.)  The report does not include

a diagnosis, but does recommend conservative treatment and follow-up testing.  (Tr. 1303.)  Ms.

Tharp has not identified further findings or follow up treatment relating to this evaluation, and

the undersigned is aware of none. Ms. Tharp has additionally failed to explain how this

evaluation is relevant to the Listings analysis for her mental health impairments, let alone how

consideration of its contents would have required the ALJ to make a different finding in that

analysis.  The undersigned cannot find that the ALJ's failure to address this record in the Listings

analysis undermines those findings.

For all of the reasons stated above, the undersigned concludes that the ALJ's findings of

no more than moderate limitations in each of the "B" criteria categories of mental functioning

were supported by substantial evidence.  This Court must accordingly defer to those findings,

regardless of whether additional evidence cited by Ms. Tharp could support greater limitations.

*See Ulman*, 693 F.3d at 714.

### 3.  Whether ALJ Properly Evaluated Combination of Severe Impairments

Ms. Tharp next argues that the ALJ failed to adequately explain his conclusions regarding

her RFC limitations as required by SSR 96-8p, and "clearly did not consider the effect of the

combination of [her] physical and psychological impairments and whether they supported the

RFC."  (ECF Doc. 14 p. 18-19, 23.)  Social Security Ruling 96-8p provides that "[t]he RFC

assessment must be based on *all* of the relevant evidence in the case record," explaining further:

> In assessing [the] RFC, the adjudicator must consider limitations and restrictions
> imposed by all of an individual's impairments, even those that are not "severe."
> While a "not severe" impairment(s) standing alone may not be significantly limit
> an individual's ability to do basic work activities, it may--when considered with
> limitations or restrictions due to other impairments--be critical to the outcome of a
> claim.

SSR 96-8P, 1996 WL 374184, *5 (July 2, 1996) (emphasis in original).  The Sixth Circuit has also recognized that an ALJ must consider "the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to render the claimant disabled," *Walker v. Sec'y of Health & Human Servs*., 980 F.2d 1066, 1071 (6th Cir. 1992)

The undersigned found in Section VI.C.1., *supra,* that the ALJ erred in his analysis of the severity of Ms. Tharp's kidney stones.  By failing to acknowledge her continued treatment for this impairment throughout the disability period, the ALJ failed to "build an accurate and logical bridge" between the evidence and his finding that the impairment was non-severe.  *Fleischer*, 774 F. Supp. 2d at 877.  Because it was not clear from his analysis whether he reviewed and considered Ms. Tharp's full treatment records for this impairment, and further failed to specify whether (and to what extent) he considered limitations caused by this impairment in developing the RFC limitations, the undersigned could not classify the ALJ's error as harmless.

For the same reasons discussed in Section VI.C.1., the undersigned concludes that the ALJ failed to demonstrate that he considered "*all* of the relevant evidence in the case record" in assessing the RFC, as required by SSR 96-8p, and in particular that he considered the combination of Ms. Tharp's impairments, both mental and physical, severe and non-severe. Because the ALJ did not clearly indicate that he considered all of Ms. Tharp's treatment records for kidney stones, and did not clearly indicate whether (or how) any limitations caused by that impairment were factored into the RFC, the undersigned finds that the ALJ has failed to build an accurate and logical bridge between the evidence and his ultimate RFC finding.

Accordingly, the undersigned recommends that the matter be remanded so that the ALJ may clearly evaluate the combined effects of Ms. Tharp's medically determinable impairments – including her recurrent kidney stones – on her RFC.

### 4.       Whether ALJ Properly Evaluated Opinion Evidence at Step Four

In her final argument, Ms. Tharp asserts that the ALJ failed to properly evaluate certain opinion evidence, including: (1) an unsigned and undated questionnaire that was submitted with Charak Center records in June 2016 (ECF Doc. 14 p. 21 (citing Tr. 595-96)); (2) a June 12, 2017 letter signed jointly by Charak Center treating sources Susan Shefner, Psy.D., Matthew Paris, Psy.D., and Vinod Bhandari, M.D. (*id.* at p. 22 (citing Tr 870)); and (3) a December 3, 2019 letter signed by Charak Center source Mikaela Pope, PA-C (*id.* (citing Tr. 1259)).

The Sixth Circuit has provided detailed instructions regarding the weight to be given the opinion of a treating source under the regulations applicable in this case:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

> If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, id. § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

42

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  While the regulations require an ALJ to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2) in determining the weight to give a treating source opinion, they do not require a factor-by-factor analysis, only that the decision include good reasons for the weight assigned.  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011).

Two of the three "opinions" challenged by Ms. Tharp may be easily disposed of under the applicable standards.  First, with respect to the unsigned questionnaire (Tr. 594-96), Ms. Tharp has not articulated a valid challenge to the ALJ's decision to assign the document little weight (ECF Doc. 14 p. 22).  In giving it little weight, the ALJ noted that the document "does not indicate the author and is not dated" and "there is nothing to indicate when the assessment was made or if it was made by an acceptable medical source or the claimant herself."  (Tr. 20.) Ms. Tharp does not contest that the document is unsigned, only noting that "the form does not include a place for the person to sign."  (ECF Doc. 14 p. 22.)  She was represented by counsel at the hearing stage, who affirmed he had reviewed the evidence and did not raise objections to the evidence or seek clarification of authorship.  (Tr. 87.)  Under the regulations, only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) can give medical opinions or be considered treating sources whose medical opinions may be entitled to controlling weight. SSR 06-03p, 2006 WL 2329939, at *2.  Because the document was not established to have been prepared or signed by an acceptable medical source, it was not a medical opinion entitled to weight, let alone an opinion entitled to controlling weight.  *See Chaney v. Comm'r of Soc. Sec.*, No. 5:18 CV 2769, 2020 WL 789189, at *11 (N.D. Ohio Feb. 18, 2020) (finding no error where an ALJ failed to weigh an anonymous opinion).  Ms. Tharp has accordingly failed to establish that the ALJ erred in giving the unsigned document little weight.

Second, Ms. Tharp's challenge to the ALJ's consideration of the December 3, 2019 letter signed by PA Pope suffers from numerous fatal defects.  (ECF Doc. 14 p. 22 (citing Tr. 1259).) In this letter, PA Pope stated Ms. Tharp was being treated at the Charak Center for bipolar disorder and chronic PTSD, that she had been compliant with appointments, medication, and treatment, that she was not able to obtain or maintain employment at that time, and that she would be reevaluated in six months.  (Tr. 1259.)  As an initial matter, Ms. Tharp fails to make any specific argument regarding this letter, such that any challenge may be deemed waived.  *See McPherson*, 125 F.3d at 995–96.  Second, PA Pope was not an "acceptable medical source" as defined under 20 C.F.R. § 404.1513(a), and therefore could not give a medical opinion or be considered a treating source. SSR 06-03p, 2006 WL 2329939, at *2.  And finally, the opinion PA Pope offered as to Ms. Tharp's functioning was that she was not able to obtain or maintain employment, which the ALJ correctly observed was a disability opinion "reserved to the Commissioner," and therefore entitled to "no weight."  (Tr. 21.)  Ms. Tharp has failed to establish that the ALJ erred in giving this document no weight.

The third opinion challenged by Ms. Tharp – the jointly signed letter of Dr. Shefner, Dr. Paris, and Dr. Bhandari (Tr. 870) – is the only opinion entitled to examination under the treating physician standard set forth above.  In this letter, Ms. Tharp's mental health providers identified her diagnoses, as well as the type and frequency of treatment she received.  (*Id.*)  They then went on to generally describe her history and symptoms, with language suggesting the information was based at least in part on Ms. Tharp's own self-report, as follows:

> *Heather reported* several symptoms that interfere with her daily functioning.  She experiences persistent anxiety, which worsens when she is in public, and often with just the thought of leaving home.  In the past, when her anxiety has gotten so

44

overwhelming that she cannot find any way to relax, it has led to suicidal ideation. Most recently, *she indicated* that her anxiety interferes with her ability to drive long distances and even bathe herself, as both a shower and car can make her feel claustrophobic.

Additionally, she experiences depressive symptoms, including low mood, low self esteem, and limited motivation.  These alternate with periods of high energy, impulsivity, and anger or irritability.  *Heather described herself as* experiencing mood swings.

Heather has never held a job, and she has spent the majority of her life raising her children.

At this time, she is seeking financial assistance, as she hopes to be able to better support her family without putting herself in a situation that may exacerbate her mental health symptoms.  *Heather expressed concerns* that leaving the house, either for regular employment or even to attend a formal disability hearing, may be difficult as a result of her anxiety and depressive symptoms.

(Tr. 870 (emphasis added).)  In weighing these statements from Ms. Tharp's treating mental

health providers, the ALJ provided the following discussion and explanation:

The undersigned has considered the medical source statement provided by Susan Shefner, Psy.D., Matthew Paris, Psy.D., and Vinad Bhandari, M.D. (Ex. B17F and B18F). These doctors described the claimant's mental health impairments and symptoms during her time as their client (*id.*). They state that the claimant attends therapy once every one to two weeks for bipolar disorder and PTSD (*id.*). They note that the claimant reports anxiety, low mood, and limited motivation, which hinders her daily functioning.

In addition, the findings of Dr. Sherner, Dr. Paris, and Dr. Bhandari generally support the moderate mental limitations assessed herein. However, their statements do not include a function-by-function analysis of the claimant's capabilities and they assign no workplace limitations. This opinion is given little weight.

(Tr. 20 (emphasis added).)

Under the applicable regulations, "medical opinions are statements from acceptable

medical sources that reflect judgment about the nature and severity of [a claimant's]

impairment(s), including [their] symptoms, diagnosis and prognosis, what [they] can still do

despite the impairment(s), and [their] physical and mental restrictions."  20 C.F.R. §

404.1527(a)(1).  While the opinion identified Ms. Tharp's diagnoses and reported symptoms, the

undersigned discerns little "judgement" offered by the providers as to the severity of the impairments, the prognosis, applicable mental restrictions, or what Ms. Tharp could still do despite her impairments.  *Id.*  This observation is consistent with the ALJ's analysis, which acknowledged the symptoms reported to hinder Ms. Tharp's daily functioning, and found the providers' findings "generally support[ed]" moderate mental limitations, but gave the treating statements little weight because they did not include a "function-by-function analysis" of her capabilities or assign specific "workplace limitations."  (Tr. 20.)

The Sixth Circuit has recognized that a doctor's report that merely repeats a patient's own assertions regarding symptoms or limitations, thus offering "no medical judgments," is not entitled to controlling weight under the treating physician standard.  See *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("Since Dr. Naum made no medical judgments, the ALJ had no duty to give such observations controlling weight or provide good reasons for not doing so.") (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir.1990); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir.2007)).  A failure to address functional abilities has also been recognized as a good reason for assigning little weight.  *See, e.g., Acevedo v. Colvin*, 20 F. Supp. 3d 377, 388 (W.D.N.Y. 2014) ("[A]bsent a discussion of Plaintiff's functional abilities, the opinions … offered little information for the ALJ to consider in conducting his RFC assessment," thus providing "good reasons for assigning … little weight.").

Here, the undersigned finds that the ALJ appropriately articulated "good reasons" for giving the treating providers' letter little weight.  It is noted that the ALJ, despite assigning the letter "little weight" due to the lack of a functional analysis of Ms. Tharp's capabilities and/or workplace limitations, nevertheless explicitly considered the symptoms and limitations reported in the letter in support of his determination that Ms. Tharp had moderate limitations in mental

functioning.  (*See* Tr. 15 (citing and considering Tr. 870 in assigning moderate limitation in adapting or managing oneself); Tr. 20 (finding symptoms and limitations described in Tr. 870 consistent with moderate mental limitations).)  This determination that the symptoms and findings were consistent with moderate limitations also aligned with his analysis of the underlying treatment records, as discussed in further detail in Section VI.C.2., *supra*.  It was also consistent with the RFC limitations he assessed as to mental functioning, which included a limitation to routine tasks in a low stress environment with no fast pace, strict quotas, or frequent duty changes, and only superficial interactions with supervisors and coworkers (defined as no negotiation, arbitration, or confrontation) and no interaction with the public.  (Tr. 16.)

Ms. Tharp's argument in favor of reversal here was limited to an unelucidated argument that the ALJ "failed to provide good reasons for failing to take into account the limitations set forth in these reports," and that the opinion was entitled to controlling weight "supported by the treating sources along with the treatment notes from Charak."  (ECF Doc. Pp. 22-23.)  For all of the reasons set forth in detail above, the undersigned finds that the ALJ did not err in his analysis or assignment of weight to any of the three records identified in Ms. Tharp's appeal.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should ensure that his analysis of Ms. Tharp's kidney stones is based on a clear and accurate review of the medical evidence and explicitly addresses the impact of that

impairment, if any, on her RFC.  He should also ensure that he clearly evaluates the combined effects of all medically determinable impairments – severe and non-severe – on the RFC.

April 11, 2022

/s/Amanda M. Knapp

_____

AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).